**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

CAROL G. WALTERS,                      )
                                                        )        CASE NO.    5:07-cv-2553
                Plaintiff,                        )
                                                        )
        v.                                              )        MAGISTRATE JUDGE VECCHIARELLI
                                                        )
MICHAEL J. ASTRUE,                    )
    Commissioner of Social Security    )        **REPORT AND RECOMMENDATION**
                                                        )
                Defendant.                      )

This case is before the magistrate judge on referral.  Plaintiff, Carol G. Walters

("Walters"), challenges the final decision of the Commissioner of Social Security, Michael

J. Astrue ("Commissioner"), denying Walters' application for a period of Disability Insurance

Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i).  This court has

jurisdiction pursuant to 42 U.S.C. § 405(g).

For the reasons set forth below, the decision of the Commissioner should be vacated

by the court and the case remanded for further proceedings consistent with this opinion.

I.  Procedural History

Walters filed an application for DIB on September 25, 2002, alleging disability due

to a back condition with neurological problems, fibromyalgia, a pinched nerve in her back,

depression, and an irregular heartbeat.  Her application was denied initially and upon reconsideration.  Walters timely requested an administrative hearing.

Administrative Law Judge Barbara L. Beran ("ALJ") held hearings on June 16, 2005 and December 1, 2005.  Walters, represented by counsel, testified on her own behalf at both hearings.  Carl Hartung testified as a vocational expert ("VE") at the second hearing.  The ALJ issued a decision on August 24, 2006 in which she determined that Walters is not disabled.  Walters requested a review of the ALJ's decision by the Appeals Counsel.  When the Appeals Counsel declined further review on June 29, 2007, the ALJ's decision became the final decision of the Commissioner.

Walters filed an appeal to this court on August 23, 2007.  Walters alleges that the ALJ erred by (1) failing to accord controlling weight to the opinions of Walters' treating physicians, (2) relying on flawed testimony from the vocational expert, and (3) conducting a faulty assessment of Walters' credibility.  The Commissioner denies that the ALJ erred.

## II.  Evidence

A.    *Personal and Vocational Evidence*

Walters was born on February 22, 1946.  She is a high school graduate and has past work experience as a clerk at a travel agency and a material handling supervisor.

B.    *Medical Evidence*

Walters began having back pain in 1989 when she fell at work at sprained her lower back, right knee, and a hip.  Her treating physician, Eugene D. Pogorelee, M.D., referred her to a neurologist , Daniel A. Jones, M.D.  Dr. Jones examined Walters on August 8, 2001 and reviewed results of nerve conduction tests and electromyographs of Walters' lower extremities.  Transcript ("Tr."), p. 134.  He noted that Walters complained of pain in

2

her back and lower extremities and weakness on her left side but denied parasthesia.  He also noted a previous diagnosis of degenerative disc disease and a herniated disc. Walters' medications included Vicoprofen, Prilosec, Premarin, Skelaxin, and Celebrex. Examination revealed normal reflexes, no motor deficit or atrophy, grossly normal gait, and no sensory deficit in the lower extremities.  The electromyograph showed no evidence of neuropathy or radiculopathy.

Walters visited Dennis R. Kolarik, D.O., for pain management on September 12, 2001.  Tr. at 170.  She reported lower back pain bilaterally, greater on the left than on the right.  Dr. Kolarik's notes indicate that Walters had received a second epidural injection on August 31, 2001.

Dr. Pogorelee examined Walters on December 4, 2001.  Tr. at 298.  She complained of sinus drainage and congestion and asked for a Kenalog shot for her fibromyalgia. Dr. Pogorelee  noted that Walters' medications included Lasix, Prilosec, Premarin, Skelaxin, Toprol XL, Effexor, and Celebrex.  He diagnosed acute sinusitis/ bronchitis or flu, fibromyalgia, and GERD.

On June 25, 2002, Walters underwent an MRI of the lumbar spine.  Tr. at 137-40. The physician interpreting the results found no disc herniation, but there was severe narrowing of the L5-S1 disc space and mild disc bulging at L3-L4, L4-L5, and L5-S1.  The MRI also revealed severe spinal stenosis and severe compression of the thecal sac at L3-L4, caused by a combination of a bulging disc and severely hypertrophic bilateral facet joints.  There was also moderate spinal stenosis at L5-S1 resulting from a diffusely bulging disc that impinged on the nerve roots bilaterally.

Dr. Pogorelee gave Walters a general check-up on June 28, 2002.  He detected a

3

heart flutter and tachycardia and prescribed a Holter heart monitor to record heart activity over an extended period.  Dr. Pogorelee saw Walters again on July 11, 2002.  Tr. at 295. Upon reviewing the results of her laboratory studies, MRI, and Holter monitor, he diagnosed spinal stenosis, degenerative disc disease, and cardiac dysrhythmia.  Dr. Pogorelee referred Walters for a gastric bypass.

Dr. Kolarik referred Walters to Michael Rivera, M.D., for additional pain management.  On August 1, 2002, Dr. Rivera noted the following upon interviewing Walters:

> This is a 56-year old white female who has the chief complaint of lower back pain for many years but has worsened over the last two years.  She describes her pain as sharp and achy in nature.  She states that her pain is in her lumbar area and does radiate down to her legs.  She states  she does notice weakness in her legs and toes.  Also, she states she has some numbness in her hands.  She states that she was told in the past that she has a pinched nerve in her neck.  The patient states her pain is worse with any type of sitting, walking a lot of [sic] trying to vacuum or sweep around the house.  She states nothing really helps her pain totally although the pain medications take the edge off.  She states she is unable to walk any distance secondary to pain.  She denies any bladder or bowel dysfunction.  She states that her symptoms do interfere with her sleep, enjoyment of life, relations with other people, work, at home and outside and also general activity.  The patient is not working at the present time.  She denies any recent trauma to her lumbar region.
>
> The patient states that previous treatments have consisted of chiropractic treatment once a month and this does help her and also has received epidural injections by Dr. Kolarik in the past and this has helped her to some degree too.

Tr. at 153.  Dr. Rivera found tenderness to palpation in Walters' cervical and lumber spine, and Walters reported increased pain upon forward and backward bending.

Dr. Rivera administered three lumbar epidural injections to Walters between August 21, 2002 and September 18, 2002.  Tr. at 145-52.  On October 10, 2002, Walters reported to Dr. Rivera that the injections had generally given her some temporary relief but that her symptoms had returned.  Tr. at 143.  She also stated that the last round of epidurals had

4

not given her much help compared to the ones she received a year before.  She reported her pain as being 10+ on a scale of 10.  Dr. Rivera found tenderness to palpation in the L4-5 region bilaterally, reduced deep tendon reflexes bilaterally, and negative straight leg raising on the left but a hamstring pull upon straight leg raising on the right.  Walters complained of numbness in her legs and thighs.  There was no edema or cyanosis.  Dr. Rivera opined that Walters should consult with Dr. Kolarik to determine if surgical intervention were necessary.

Dr. Pogorelee completed a Multiple Impairments Questionnaire assessing Walters' condition on October 22, 2002.  Tr. at 268-75.  In answer to most of the questions on the questionnaire, he referred the reader to attached test results, office notes, and consultations.  He opined that it would be best if Walters did not sit continuously in a work setting and that Walters could frequently lift or carry up to five pounds and occasionally lift or carry up to ten pounds, but could not lift or carry more than that.  He denied that Walters was limited in her ability to engage in repetitive reaching, handling, fingering, or lifting.  Dr. Pogorelee gave Walters' prognosis as fair.

On October 13, 2002, Allen S. Hoaglund, D.C., Walters' chiropractor, summarized his treatment of Walters and her condition.  Tr. at 194.  He noted that since late 1999 he had been able to offer her only temporary relief from pain and that she has constant lower back pain and frequent upper back, neck, and right arm pain.  He attributed that pain to degenerative disc disease and degenerative joint disease and concluded as follows:

> Carol has constant pain from sitting which is from the loss of disc material between the vertebra L4-L5 and L5-S1, and the virtual rubbing of bone upon bone at the L5-S1 level.  There are no conservative techniques by which to stop or improve further progression of the disease.  In my opinion, Carol is progressive toward further advancement of her degenerative conditions, especially of the lower back.

5

*Id.*

In a letter dates October 29, 2002, Dr. Pogorelee noted that he had been treating Walters for cardiac dysrhythmia, lumbar degenerative disc disease, spinal stenosis, fibromyalgia, and depression. Tr. at 267. He also reported that Walters had exhausted diet plans and appetite-diminishing medications was now seeking gastric bypass surgery to reduce her weight.

In November 2002, Dr. Kolarik completed a Multiple Impairments Questionnaire and wrote a narrative cover letter assessing Walters' condition. Tr. at 156-65. He estimated Walters' pain as an eight on a 10-point scale and her accompanying fatigue as a six on a 10-point scale. Dr. Kolarik reported that he had been unable to completely relieve Walters' pain without unwanted side effects and opined that Walters could not sit or stand/walk for more than an hour in an eight-hour work day. He also indicated that it was medically desirable that Walters not sit continuously in a work setting, that she should get up and move around for about a half hour after sitting a half hour, and that she take frequent breaks during the work day. Dr. Kolarik opined that Walters could frequently lift or carry up to five pounds and occasionally lift or carry up to ten pounds, but could not lift or carry more than that. He did not believe that Walters was limited in her ability to engage in repetitive reaching, handling, fingering, or lifting. In the questionnaire and covering letter, he reported that Walters had tried Medrol dosepacks, Nortiptyline, Celebrex, Vicoprofen, Skelaxin, epidural injections and chiropractic care to alleviate her pain. He asserted that pain and fatigue caused symptoms sufficient to frequently interfere with attention and concentration and he denied that emotional factors contributed to the severity of Walters' pain or that she was a malingerer. Dr. Kolarik predicted that Walters would have good days and bad days

and would be absent from work about two to three times a month.  Dr. Kolarik also opined, "I believe her prognosis for recovery is somewhat limited.  I believe she does have a surgical problem that may be amenable to a surgical decompression at L5-S1 as well as L3-4."  Tr. at 156.  In justifying his opinion, Dr. Kolarik referred to physical examination, x-rays, and an MRI "which . . . substantiated and reinforced the above diagnosis and impressions."  Tr. at 156.

On November 12, 2002Robert E. Norris, M.D., completed a Physical Residual Functional Capacity Assessment after reviewing Walters' record.  Tr. at 51, 227-34.  He found that Walters could lift 20 pounds occasionally and 10 pounds frequently, could stand or walk two hours in an eight-hour workday and sit for six hours in an eight-hour workday, and was unlimited in her ability to push or pull.  He also found that Walters could never climb ladders, ropes, or scaffolds and could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  He found no manipulative, visual, communicative, or environmental limitations, and thought that her allegations of pain were valid.  Dr. Norris also indicated that there was no treating or examining source statement regarding Walters' physical capacities in the file.  Dr. Norris opined that Walters was not disabled.  His opinion was affirmed by Paul T. Hoban, M.D., on April 30, 2003.  Tr. at 52, 235.

Dr. Hoaglund completed a questionnaire assessing Walters' condition on February 23, 2003.  Tr. at 192-93.  He noted that Walters had reduced ranges of motion in her lumbar and cervical spine, walked with a waddle, and used a necessary walker occasionally.  He diagnosed Walters as suffering from degenerative disc disease and bone spurs in the lumbar and cervical spine.  Dr. Hoaglund opined that sitting, standing, walking, bending, lifting, carrying, and handling objects were at times difficult for Walters.  He added:

7

>    Mrs. Walters is not a person to complain about her physical conditions.  She
> has a very high tolerance to pain in my opinion.  Her physical activities are possible
> but at times with a great deal of pain.  She has physical pain at all times and some
> times are more tolerable than others.

Tr. at 193.

When Dr. Pogorelee saw Walters on February 25, 2003, he noted that she had been

in the emergency room on January 28, 2003 because of chest pain, headache, and

shortness of breath.  Tr. at 290.  He also noted that Walters was preparing for gastric

bypass surgery.  Dr. Pogorelee diagnosed her as suffering from cardiac dysrhythmia, spinal

stenosis, degenerative disc disease at L5-S1, chest pain, depression, hyperglycemia, and

morbid obesity.  A persantine cardiolite stress test detected a small to moderate inferoapical

scar but no ischemia.  Tr. at 245.

On March 3, 2003, Dr. Pogorelee completed a Psychiatric/Psychological Impairment

Questionnaire regarding Walters.  Tr. at 337-44.  He diagnosed Walters as suffering from

degenerative disc disease at L5-S1, spinal stenosis at L3-L4, morbid obesity, depression,

anxiety, and dyspnea.  He described Walters as exhibiting poor memory, sleep disturbance,

mood disturbance, anhedonia or pervasive loss of interests, feelings of guilt/worthlessness,

difficulty thinking or concentrating, catatonia or grossly disorganized behavior, social

withdrawal or isolation, decreased energy, and hostility and irritability.  Dr. Pogorelee

opined that Walters was mildly limited in her abilities to remember locations and work-like

procedures; understand and remember detailed instructions;  carry out simple one- or two-

step instructions; carry out detailed instructions; maintain attention and concentration for

extended periods; perform activities within a schedule, maintain regular attendance, and

be punctual within customary tolerance; sustain ordinary routine without supervision; make

8

simple work related decisions; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from superiors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel to unfamiliar places or use public transportation; and set realistic goals or make plans independently.  He also opined that Walters was moderately limited in her abilities to work in coordination with or in close proximity to others without being distracted by them and complete a normal work week without interruptions from psychologically-base symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Dr. Pogorelee asserted that Walters could not do any heavy lifting, kneeling, bending, or squatting and could not sit or walk for long periods of time.  He listed her medications as Effexor, Skelaxin, Topprol, Vicoprofin, Demadex, Premarin, Prevacid, and Bextra.  Dr. Pogorelee denied that Walters was a malinger or that her psychiatric condition exacerbated her pain.  He believed that she was capable of tolerating low stress, but he also thought that her impairments were likely to produce "good days" and "bad days."  Finally, he opined that she would be likely to be absent from work more than three times a month.

On March 24, 2003, Walters complained to Dr. Pogorelee of spasms and sore throat.  Tr. at 287.  Dr. Pogorelee diagnosed morbid obesity, strep throat, and dyspnea.  Walters returned on May 5, 2003 after her gastric bypass surgery.  Tr. at 286.  Dr. Pogorelee noted that she was doing very well after her surgery and treated her for thrombophlebitis in her left wrist.  He also gave Walters a Kenalog injection at her request and replaced her prescription for Effexor with one for Paxil CR.

9

Dr. Kolarik completed a Lumbar Spine Impairment Questionnaire regarding Walters on April 1, 2003.  Tr. 215-21.  He reported that he had been treating Walters every few months since April 3, 2000.  He diagnosed her as suffering from degenerative disc disease at L5-S1, lumbar spinal stenosis at L3-4.  His prognosis was guarded, and he believed that Walters would need decompressive lumbar surgery in the future.  Dr. Kolarik referred to the limited range of motion of Walter's lumbar spine, an absent Achilles reflex, and an MRI of her lumbar spine to support his diagnosis.  He listed Walter's symptoms as including constant mild to moderate bilateral pain in the lower back and buttocks and leg weakness with ambulation.  The pain, according to Dr. Kolarik, was frequently severe enough to interfere with attention and concentration.  He stated that the pain was precipitated by walking, standing, bending, and general weight-bearing and gave Walters' obesity as a factor related to her pain.  He asserted that Walters' symptoms and functional limitations were reasonably consistent with her physical impairments and that he had been unable to relieve Walters' pain without unacceptable side effects.  Dr. Kolarik opined that Walters could sit for two hours in an eight-hour day, stand/walk for one hour in an eight-hour day, would have to get up and move around every half hour and could not sit again for one hour. He also opined that Walters could frequently lift or carry up to  five pounds, occasionally lift or carry five to ten pounds, and never lift or carry more than 20 pounds.  Dr. Kolarik reported that he had treated Walters with epidural and facet injections and had given her low back exercises to do at home.  Dr. Kolarik predicted that Walters would have to take frequent unscheduled breaks during an eight-hour work day, would have to rest a half hour to an hour before returning to work, could not perform a job that would require sustained activity, and would be likely to have "good days" and "bad days."  He asserted that Walters

10

should not engage in pushing, pulling, bending, or stooping.  He denied that Walters was a malingerer or that emotional factors contributed to her symptoms or functional limitations.

John Quinn, Ph.D., a psychologist, examined Walters at the request of the Bureau of Disability Determination on April 22, 2003.  Tr. at 222-26.  Walters asserted that the psychological basis for her disability was depression, which she rated as a five on a 10-point scale.  She reported hat her daily interactions with most persons outside her family were stressful.  She reported her daily activities as follows:

> In a typical day the examinee tries to do a little housework, tries to read and watches television.  The examinee reported a reduction in her physical ability due to back pain regarding sound, noise levels, extreme temperatures, awkward positions, sitting, standing, climbing, walking, running, kneeling, crouching, stooping, balancing, bending, twisting, repetitive motions, pushing and pulling.  She reported need help [sic] with personal needs such as running errands and heavy housework. The examinee has a driver's license, passed the written exam without needing an oral presentation of the driver's exam, drives typical distances for typical lengths of time.  For enjoyment the examinee watches television, reads and uses the computer.  Once a week or more the examinee sees friends or family who know the examinee well and who the examinee trusts.  The examinee does manage the income, and has no trouble making change, deciding what to buy, living within a budget, maintain[ing] a checking account. and reading and understanding bills.

Tr. at 223.  Walters reported low energy levels, feelings of worthlessness, and low self-esteem.  Dr. Quinn assessed these depressive symptoms as mild.  He diagnosed Walters as suffering from depression and low back pain and assigned her a Global Assessment of Functioning ("GAF") of 61.[1]  Dr. Quinn found Walters mildly limited in her ability to maintain concentration, persistence, and pace to perform simple repetitive tasks which do no require complicated or detailed verbal instructions and procedures and mildly limited in her ability

---

[1]  A GAF of 61-70 indicates some mild symptoms (*e.g.*,  depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

to withstand the stress and pressures associated with daily work activity to work a typical eight-hour work day and 40-hour work week.  He found no limitations in Walters' ability to related to others or her ability to understand, remember, and follow instructions.

On September 13, 2003, Dr. Pogorelee wrote the following "To Whom It May Concern":  "[Walters] remains my patient and in my best medical judgment, I hereby state that since my report dated 10/22/02, [Walters] continues to be disabled, and that the report remains valid."  Tr. at 266.  Dr. Pogorelee gave Walters another Kenalog injection for her fibromyalgia on November 4, 2003 and increased her dose of Paxil CR.  Tr. at 281.

On December 9, 2003, Walters reported that her depression had improved since the increase in her prescription for Paxil CR.  Tr. at 280.  Dr. Pogorelee noted that Walters had lost more than 90 pounds since her gastric bypass surgery and that her mood and affect had improved.  Walters reported, however, that she was sleeping poorly and having pain in both hips bilaterally.  He prescribed x-rays of Walters' hips, pelvis, and lumbar spine bilaterally.

Dr. Pogorelee gave Walters another Kenalog injection on March 1, 2004.  Tr. at 279. Walters reported that her feet and legs were in constant pain and that she was experiencing parasthesia bilaterally.  Dr. Pogorelee noted that an MRI of the lumbar spine confirmed spinal stenosis and degenerative disc disease.  He also noted that he had spoken to Dr. Kolarik who had opined that Walters' pain in her lower extremities was due to neurogenic claudication.

Also on March 1, 2004, Dr. Pogorelee completed a Multiple Impairments Questionnaire assessing Walters' condition.  Tr. at 258-65.  He diagnosed Walters as suffering from lumbar spinal stenosis, lumbar and cervical degenerative disc disease, and

neurological claudication of the lower extremities.  His prognosis was guarded.  He referred to an absence of deep tendon reflexes and an MRI as supporting his diagnosis and described Walters' primary symptoms as pain in the lower back and radiating pain into the legs, greater on the left than on the right.  Dr. Pogorelee described the pain as constant, the result of nerve compression due to spinal stenosis, and precipitated by sitting and walking.  He rated Walters' pain as 10 on a 10-point scale and her fatigue as 9 on a 10-point scale.  He believed that this pain was consistent with her physical impairments and asserted that he had not been able to relieve Walters' pain without unacceptable side effects.  Dr. Pogorelee opined that Walters could sit for one hour in an eight-hour work day and stand/walk for one hour in an eight-hour work day.  He also opined that Walters could lift or carry up to 10 pounds frequently, 10-20 pounds occasionally, but never more than 20 pounds.  He denied that Walters' had significant limitations in doing repetitive reaching, fingering, or lifting.  He asserted, however, that in an eight-hour workday her upper extremities would be moderately limited in grasping, turning, or twisting objects; using fingers/hands for fine manipulations; and using her arms for reaching (including overhead reaching).  He also reported that physical therapy had made Walters' problems worse, and he advised lumbar disc surgery.  Dr. Pogorelee thought that Walters' symptoms would worsen in a work environment, her symptoms prevented her from keeping her neck in a constant position (as would be required for prolonged viewing of a computer screen), she could not perform a full-time job that required activity on a sustained basis, and she was capable of tolerating moderate stress.  Dr. Pogorelee denied that Walters was a malingerer or that emotional factors contributed to the severity of her symptoms.

On June 18, 2004 Walters complained to Dr. Pogorelee of bilateral parasthesia.  Tr.

13

at 334.  On November 4, 2004, Walters complained of right shoulder pain and an inability to raise her arm above her head without decreased strength.  Tr. at 332.  Dr. Pogorelee diagnosed impingement syndrome of the right shoulder.

Walters reported to Dr. Pogorelee on January 13, 2005 that the shot she had received in her right shoulder helped but that it was feeling painful again.  Tr. at 330.  She also reported that her left foot and leg were in severe pain, with pain radiating into her foot and toes, and that it hurt her tailbone to sit.  Movement of the right shoulder and left hip was painful.  Dr. Pogorelee diagnosed Walters as suffering from lumbar spinal stenosis, degenerative lumbar disc disease, right shoulder impingement syndrome, and neuropathic pain syndrome.

On April 11, 2005, Walters complained to Dr. Pogorelee of fatigue and requested a Kenalog injection.  Tr. at 325.  Dr. Pogorelee noted that a bone density scan revealed developing osteopenia.  He gave Walters a Kenalog injection.

C.    *Hearing testimony*

Walters testified at her hearings on June 16, 2005 and December 1, 2005.  Tr. at 381-88, 402-23.  At the June 16, 2005 hearing, Walters testified that she has not worked since March 28, 2002.  She had worked a series of sedentary jobs until her employer closed down, then she drew unemployment for about a year.  She asserted, however, that even if her employer hadn't shut down, she would have had to quit because she was having trouble with her back.  When her unemployment benefits ended, she went to work for a travel agency as a clerk, but, according to Walters, she had to quit after three months because she was unable to repeatedly navigate the stairs at the job and because of pain in her back.

14

At the December 1, 2005 hearing, Walters testified that she drives for short, local trips every day, drove the 45 minute trip to the hearing that morning, and twice a year drove a five-hour trip to see her daughter, stopping to stand and walk every hour.  Tr. at 396-97. Walters averred that most of the time she had a lot of pain in her back and legs, restless leg syndrome, tingling and numbness in her feet, and pain in her right shoulder.  According to Walters, her back had been hurting for about 35 years, although it worsened after several accidents.  The pain in her back was usually a seven or eight on a 10-point scale. Her legs had been hurting for about 10 years, and the tingling an numbness in her feet had begun about two years earlier.  She testified that she did not get much sleep at night because of the pain and because of restless leg syndrome.  Walters also stated that prolonged standing or sitting aggravated her back pain and that she could not sit or stand for more than 45 minutes.  In addition, Walters claimed that she could not lift more than 10 pounds, in part because of the pain in her right shoulder.  Medication helped with the pain in the evening, Walters said, but she would have trouble staying awake the day after taking medication.

Walters testified that on an average day she tries to do some housework, including laundry and cooking, but someone has to come in to do the heavy work.  She occasionally goes shopping, but someone has to bring the groceries to the car for her.  She told the ALJ that she takes care of her own washing and grooming, but she does not vacuum, sweep, or take out the trash.  For entertainment, she reads, watches some television, writes letters, goes to church, visits her mother, and occasionally plays cards with friends.

Walters said that she had some problems with depression, which she treated with Paxil.  She testified that some days she couldn't be around people and that this would

15

interfere with her working a regular job.

When the VE testified, tr. at 423-28, the ALJ began by asking the VE to assume the limitations imposed by Dr. Norris on November 12, 2002 in his Physical Residual Functional Capacity Assessment.  Tr. at 51, 227-34.  The ALJ asked the VE if Walters would be able to perform her clerical job at the travel agency with those limitations.  The VE testified that she could.  The ALJ added limitations of walking or standing for only 15 minutes to an hour and avoiding hazards, and the VE testified that Walters would still be able to perform her past clerical job with those additional limitations.

The ALJ then asked the VE to assume the limitations imposed by Dr. Pogorelee on March 1, 2004 in his completed Multiple Impairments Questionnaire assessing Walters' condition.  Tr. at 258-65.  When the ALJ asked the VE if Walters could perform her past clerical job with those limitations, the VE testified that she could not.  When asked, the VE also testified that there would be no other work that Walters would be able to perform.

Finally, the ALJ asked the VE to assume the limitations imposed by Dr. Kolarik on April 1, 2003 in his completed Lumbar Spine Assessment Questionnaire.  Tr. 215-21. When the ALJ asked the VE if Walters would be able to perform any work with those limitations, the VE testified that she would not.

### III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted

or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). To receive SSI benefits, a recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

## IV. Summary of Commissioner's Decision

In relevant part, the ALJ made the following findings:

1.  The claimant meets the disability insured status requirements of the Social Security Act on March 28, 2002, the date she stated she became unable to work, and continues to meet them through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since March 28, 2002.

17

3.    The medical evidence establishes that the claimant has a "severe" combination of impairments best described as a history of morbid obesity, status post gastric bypass surgery; degenerative changes of the cervical and lumbar spine; and a history of heart dysrythmias [sic], but that she does not have an impairment or combination of impairments listed in , or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.  Her depression is not severe.

4.    The claimant's testimony regarding her limitations is credible to the extent that she has a severe combination of physical impairments. However, for the reasons stated in the body of this decision, the claimant's testimony is not credible to show that she is incapable of all work activity at any exertional level.

5.    The claimant has the residual functional capacity to lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently.  She can sit for six hours throughout an eight hour workday.  She can stand and walk a total of two hours in an eight hour work day.  The frequency of the standing and walking can be for up to 15 minutes every hour.  She can only occasionally climb ramps and stairs, but she can never climb ladders, ropes, or scaffolding.  She can only occasionally balance, stoop, kneel, crouch, or crawl.  She cannot work around automotive equipment or hazardous machinery.

6.    The claimant's past relevant work, as she performed it, did not require the performance of work-related activities precluded by the above limitations.

7.    The claimant's impairments do not prevent her from performing her past relevant work.

8.    The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision.

Tr. at 30-31 (citations omitted).

The ALJ adopted the opinion of the state agency physicians, Drs. Norris and Hoban, in establishing Walters' residual functional capacity.  In rejecting the physical functional capacity assessments of Drs. Kolarik, Pogorelee, and Hoaglund, the ALJ wrote as follows:

These opinions appear to be based primarily on the claimant's subjective complaints rather than objective medical evidence and are rejected, as they are inconsistent with the greater weight of the objective evidence, including the findings on physical examination.  The totality of the medical evidence supports a finding that the claimant has less limitations of function than assessed by these doctors.

18

Tr. at 26.

In discounting Walters' allegations regarding the level of pain that she experienced,

the ALJ wrote as follows:

> [T]he medical evidence of record fails to substantiate any documented impairment
> capable of causing this level of radiating pain.  MRI and x-rays evidence do support
> degenerative disc disease of the lumbar spine at the L3-L4 and L5-S1 levels with
> spinal stenosis and compression, as well as degenerative disc disease of the
> cervical spine at the C5-C6 levels.  However, other than some paravertebral muscle
> spasm, there is little in the way of objective findings on physical examination to
> support that [sic] the disabling degree of pain and limitations that the claimant
> alleges.  Moreover, an EMG performed on August 8, 2001 was completely normal
> and ruled out the presence of neuropathy or radiculopathy in the claimant's lower
> extremities.  There is no objective medical evidence to document ongoing sensory
> or motor deficits, and deep tendon reflexes have been normal.

Tr. at 27.  The ALJ also found that Walters was not credible because she asserted that her

back pain had increased after her bypass surgery when "the weight loss should have

significantly helped to diminish the level of pain she experienced prior to the bypass

surgery."  *Id.*  The ALJ also found that Walters' complaints about depression were not

supported by evidence in the record.  In addition, the ALJ found that Walters' receiving

unemployment benefits for a year, which were predicated on an ability to work, was

inconsistent with her claim that she was disabled.  The ALJ also asserted that Walters'

everyday activities were inconsistent with her claimed limitations.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence

in the record to support the administrative law judge's findings of fact and whether the

correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125

(6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and

inferences are reasonably drawn from the record or supported by substantial evidence,

even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

Walters alleges that the ALJ erred by (1) failing to accord controlling weight to the opinions of Walters' treating physicians, (2) relying on flawed testimony from the VE, and (3) conducting a faulty assessment of Walters' credibility.  As the first two allegations are related, they will be considered together.

A.      *Whether the ALJ erred in not giving controlling weight to the opinions of treating physicians and forming a hypothetical for the VE based on the state agency physician's opinion.*

Walters contends that the ALJ erroneously failed to accord controlling weight to the opinion of her treating physicians.  The Commissioner denies that the ALJ erred.

The medical opinion of treating physicians should be given greater weight than those of physicians hired by the Commissioner.  *Lashley v. Secretary of Health and Human Servs.,* 708 F.2d 1048 (6th Cir. 1983).  Medical opinions are statements about the nature and severity of a patient's impairments, including symptoms, diagnosis, prognosis, what a patient can still do despite impairments, and a patient's physical or mental restrictions.  20 C.F.R. § 404.1527(a)(2).  This is true, however, only when the treating physician's opinion is based on sufficient objective medical data and is not contradicted by other evidence in the record.  20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *Jones v. Secretary of*

20

*Health and Human Services*, 945 F.2d 1365, 1370 & n.7 (6th Cir. 1991); *Sizemore v. Secretary of Health and Human Services*, 865 F.2d 709, 711-12 (6th Cir. 1988).  Where there is insufficient objective data supporting the opinion and there is no explanation of a nexus between the conclusion of disability and physical findings, the factfinder may choose to disregard the treating physician's opinion.  *Landsaw v. Secretary of Health and Human Servs.,* 803 F.2d 211, 212 (6th Cir. 1986).  The factfinder must, however, articulate a reason for not according the opinions of a treating physician controlling weight.  *Shelman v. Heckler*, 821 F.2d 316 (6th Cir. 1987).

In adopting the opinion of the state agency physician and rejecting the opinions of Walters' treating physicians, the ALJ wrongly asserted that the opinions of the treating physicians rested primarily on Walters' subjective complaints.  The record flatly contradicts this assertion.  In assessing Walters' physical capacities, her treating physicians repeatedly referred to physical examinations, reduced ranges of motion, x-rays, and an MRI.  Three of her physicians also noted the absence of deep tendon reflexes in the Achilles.  Tr. at 143, 216, and 258.  Inexplicably, the ALJ asserted that Walters' claims about her limitations were not believable, in part, because her deep tendon reflexes were normal.

In addition, the ALJ discredited the opinions of Walters' treating physicians and attacked Walters' credibility by reaching her own medical conclusions without the benefit of supporting opinions from a medical expert.  The ALJ's concluded that "the totality of the *medical* evidence supports a finding that the claimant has less limitations of function than assessed by these doctors."  Tr. at 26 (emphasis added).  As no medical expert testified regarding the extent of the "totality of the medical evidence," the ALJ's conclusion about what the "totality of the medical evidence" means rests exclusively on the ALJ's own

21

medical opinion.  Elsewhere, too, the ALJ's opinion includes her own interpretations of medical evidence.  For example, the ALJ asserts that "a careful review of the record does not disclose sufficient objective medical evidence to substantiate the severity of the symptoms and degree of functional limitations alleged" and "the medical evidence of record fails to substantiate any documented impairment capable of causing this level of radiating pain."  Tr. at 26, 27.  These opinions run directly counter to the interpretations of Walters' treating physicians, based on their examinations of Walters and their review of x-rays and an MRI, and they are unsupported by the testimony of a medical expert.

In sum, the ALJ's decision to reject the opinions of Walters' treating physicians and give primary weight to the opinions of the state agency physicians rested upon a faulty reading of the record and upon medical opinions ungrounded in medical expertise.  For these reasons, it was erroneous.  Consequently, the ALJ's formation of a hypothetical question to the VE based on the limitations found by the state agency physicians rather than on the limitations found by Walters' treating physicians was also erroneous.  It cannot be said, therefore, that the ALJ's findings regarding Walters' functional limitations or Walters' ability to perform her past relevant work were supported by substantial evidence.

B.      Whether the ALJ erred in conducting a faulty assessment of Walters' credibility

Walters contends that the ALJ  erred in her assessment of Walters' credibility.  In particular, Walters claims that the ALJ erred by making a determination regarding Walters' credibility based upon only three factors:   the conservative nature of Walters' treatment, the objective medical evidence, and Walters' cessation of work due to her employer's closing rather than for medical reasons.  Moreover, Walters argues, the ALJ erred in consideration of those three factors.   The Commissioner denies that the ALJ's

22

determination of Walters' credibility was based upon a consideration of only three factors or that the ALJ erred in considering those factors.

Social Security Ruling 96-7p describes how to evaluate a claimant's credibility when weighing the claimant's statements about pain.  The ruling directs decisionmakers to look at the objective medical evidence relevant to the claimant's statements about pain and to look at seven other factors:

> 1.  The individual's daily activities;
> 2.  The location, duration, frequency, and intensity of the individual's pain or other symptoms;
> 3.  Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5.  Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6.  Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p at 34485.

Examination of the ALJ's decision demonstrates that the ALJ did not rely upon three factors alone in determining that Walters was not entirely credible.  In addition to the three factors cited by Walters, the ALJ referred to Walters' daily activities, exaggerations and inconsistencies in Walters' statements, and the unexpected worsening in Walters' pain after her successful weight loss.  Thus, Walters' argument that the ALJ relied exclusively on three factors in assessing Walters' credibility is wrong.

Walters also argues that the ALJ erred in concluding that the conservative nature of Walters' treatment does not support Walters' allegations of pain.  According to Walters, "there is no indication that more aggressive treatment was medically recommended, or that

23

Ms. Walters' condition was amendable to such treatment." Plaintiff's Brief, Doc. No. 14, p. 19. The Commissioner 's response to this argument is that if no more aggressive treatment had been recommended, that is itself an indication that Walters' doctors did not believe that Walters was in great pain.  The Commissioner also notes that although at least one treating physician recommended surgery, Walters failed to follow up on this possibility.  That, too, the Commissioner argues, undercuts Walters' statements about the extent of her pain. These counter-arguments are well-taken.

Walters also asserts that the ALJ noted that Walters had first stopped work due to her employers' cessation of business but did not consider that Walters made a three-month attempt to work subsequent to this.  The ALJ, however, did note Walters' return to work in his decision.  Moreover, the ALJ's main conclusion regarding Walters' sabbatical from work was related to her receipt of unemployment benefits for a year after her employer shut down and to her taking computer courses during that time.  The ALJ noted that the receipt of unemployment benefits is contingent upon an assertion that one is ready and able to work at any time and the ability to take computer classes indicates at least an ability to do sedentary work.  Consequently, the ALJ concluded, Walters' assertion that she was disabled in the year subsequent to her employer's cessation of business is not entirely credible.  This is not an unreasonable conclusion.

Walters' argument that the ALJ misread the objective medical evidence is more meritorious.  As has already been pointed out, the ALJ erred regarding the extent to which Walters' allegations of pain were supported by objective medical evidence and reached conclusions about how the medical evidence should be interpreted without the benefit of medical expertise.

There are at least two other respects in which the ALJ improperly discredited Walters' statements based on a misuse of objective medical evidence in the record. First, the ALJ referred to an August 8, 2001 nerve conduction test as having "ruled out the presence of neuropathy or radiculopathy in the claimant's lower extremities." Tr. at 134. There are two things wrong with this conclusion. First, the neurologist concluded that there was no evidence of neuropathy or radiculopathy at that time, not that neuropathy or radiculopathy were "ruled out." Second, the earliest evidence in the record of Walters' claiming to have pain radiating into her legs or complaining of numbness in her legs is in August 2002, one year *after* the nerve conduction study. The ALJ used the discrepancy between the results of a test administered prior to Walters' complaints of radiating pain and numbness to adjudge that her later complaints of radiating pain and numbness lacked credibility.

Second, the ALJ also improperly discredited Walters' testimony because of allegedly inconsistent statements about pain relief:

> The claimant has alleged that the narcotic pain relievers do not relieve her constant back pain. However, elsewhere she has reported that Bextra really helped (Exhibit 20F, p. 39 [tr. at 296]); that lumbar epidural cortisone injections relieved her pain for up to nine months at a time (Exhibit 7F, p. 11 [tr. at 166]); and that prolotherapy shots lessened her pain (Exhibit 25F [tr. at 335]).

Tr. at 28. There are several problems with the ALJ's statements. First, none of the treatments referred to in the paragraph employs a "narcotic" pain reliever,[2] so any

---

[2] DORLAND'S MEDICAL DICTIONARY (28 ed.1994) defines *narcotic* as "1. pertaining to or producing narcosis. 2. an agent that produces insensibility or stupor, applied especially to the opiods . . . ." It defines *narcosis* as "a nonspecific and reversible depression of function of the central nervous system marked by stupor or insensibility produced by opioid drugs."
Cortisone is a synthetic glucocorticoid hormone converted by the body to corisol,

25

allegation that one of them helped relieve Walters' pain does not contradict her assertion that narcotic pain relievers do not relieve her back pain.  Second, reference to Exhibit 20F, p. 39 [tr. at 296] does not reveal any report that Bextra "really helped" Walters' back pain.  Third, although the ALJ notes that Walters' initial round of epidural cortisone injections had relieved her pain for up to nine months at a time, she neglects to note that Walters reported the second round of epidurals to be far less effective than the first.

Whether these errors with respect to the medical record are sufficient to alter significantly the ALJ's assessment of Walters' credibility is not a matter within this court's purview.  Courts hearing appeals from a decision of the Commissioner do not resolve conflicts in the evidence or decide questions of credibility.  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  As this case must be remanded because of the ALJ's errors with respect to the opinions of Walters' treating physicians, the ALJ will be able to cure upon remand any errors made regarding her assessment of Walters' credibility.

## VII.  Decision

For the reasons given above, the court should vacate the decision of the Commissioner and remand the case for further proceedings.  Upon remand, the ALJ should (1) either accept the functional limitations imposed by Walters' treating physicians or ask a medical expert to assess the record as a whole to determine whether the medical

_____

which affects the metabolism of glucose, protein, and fats.  DORLAND'S at 384.  Bextra is a non-steroidal anti-inflammatory drug.  *See* www.drugs.com/Bextra.html.  Neither induces insensibility or stupor and neither is listed as a narcotic by THE PHYSICIAN'S DESK REFERENCE, 203 (62d ed. 2008).

*Prolotherapy*, an abbreviation for "proliferation injection therapy," consists of injecting a non-active irritant into an injured area to cause inflammation, thus spurring the body to rebuild tendons and ligaments.  It does not employ narcotics or other analgesics.  *See* www.prolotherapy.org.

evidence supports the functional limitations imposed by Walters' treating physicians and (2) re-assess Walters' credibility in light of the errors described above in assessing the Walters' credibility in relation to the objective medical evidence.

s/ Nancy A. Vecchiarelli
U.S. Magistrate Judge

Date:  July 24, 2008

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v.Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

27